## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Cambrian Holding Company, Inc., *et al.*,[1] | ) | Case No.  19-51200 (GRS) |
| | ) | |
| | ) | (Joint Administration Proposed) |
| | ) | |
| Debtors. | ) | |
| | ) |    Honorable Gregory R. Schaaf |

## DECLARATION OF J. MARK CAMPBELL IN SUPPORT OF
## FIRST DAY MOTIONS OF DEBTORS AND DEBTORS-IN-POSSESSION

I, J. Mark Campbell, hereby declare as follows:

1.      I am President of Cambrian Holding Company, Inc.  ("**Cambrian Holding**").
Cambrian Holding, Shelby Resources, LLC ("**Shelby Resources**"), and their direct and indirect
subsidiaries are debtors-in-possession in these bankruptcy cases (the "**Debtors**").  Additionally, I
hold: (i) a one hundred percent (100%) equity stake in Cambrian Holding (250 shares); and (ii) a
one hundred percent (100%) equity stake in Shelby Resources (20,625 units).  I have been
involved in the Debtors' preparation for the commencement of these bankruptcy cases.

2.      As President of Cambrian Holding, I have extensive familiarity with the day-to-
day operations, business affairs, books, and records of the Debtors.  I am authorized by the
Debtors to submit this Declaration.  I am familiar with the Debtors' relationships with the
lenders, lessors, trade vendors, and other parties necessary to the Debtors' ongoing business
operations.

---

[1] The Debtors in these Chapter 11 cases are (with the last four digits of their federal tax identification numbers in
parentheses): Cambrian Holding Company, Inc.  (8203), Cambrian Coal LLC (3394), Apex Energy, Inc.  (3455),
C.W.  Augering, Inc.  (2875), Marshall Resources, Inc.  (9735), PLM Holding Company LLC (7427), Bear Branch
Coal LLC (0674), Clintwood Elkhorn Mining LLC (6910), Gatliff Coal LLC (5768), Perry County Coal LLC
(4382), Ray Coal LLC (0981), Whitaker Coal LLC (8270), Pike-Letcher Land LLC (8952), Premier Elkhorn Coal
LLC (8951), Raven Rock Development LLC (1351), Rich Mountain Coal LLC (1974), S.T.  & T.  Leasing, Inc.
(0340), T.C.  Leasing, Inc.  (7705), and Shelby Resources, LLC (5085).

3.      I submit this declaration (this "**Declaration**") pursuant to 28 U.S.C.  § 1746 in support of the Debtors' voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and first day motions and applications filed contemporaneously herewith.   Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, and/or my opinion based upon personal experience and knowledge of the Debtors' businesses and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**Commencement of Reorganization Proceedings**

4.      On June 16, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors intend to continue in the possession of their respective properties and management of their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      Part I of my Declaration describes the businesses of the Debtors.  Part II of my Declaration sets forth the circumstances giving rise to the commencement of these chapter 11 cases.  Part III sets forth the relevant facts in support of the various first day motions (the "**First Day Motions**") and applications (the "**Applications**") filed by the Debtors concurrently with, or shortly after, the filing of this Declaration.  I am familiar with the First Day Motions and the Applications filed by the Debtors.

I.      **THE DEBTORS' BUSINESSES**

A. **Coal Operations**

6.      The Debtors' core business is producing and processing metallurgical (or "**met**") coal and thermal (or "**steam**") coal for use by utility providers and industrial companies located primarily in the eastern United States and Canada.  The Debtors began in 1991 and, over time,

2

acquired various mines and mining-related assets from major coal corporations, including Marshall Resources, Arch Coal, and TECO. The Debtors mine, ship, and market coal from underground and surface mines located in Kentucky and Virginia. Presently, the Debtors operate at three primary mining facilities in Kentucky and Virginia: (i) Perry County Coal, located near Hazard, Kentucky; (ii) Premier Elkhorn Coal LLC, located near Dorton, Kentucky; and (iii) Clintwood Elkhorn Mining LLC, located in eastern Kentucky and western Virginia (collectively, the "**Cambrian Facilities**"). Graphic 1, below, depicts the locations of the various Cambrian Facilities throughout eastern Kentucky and western Virginia. Graphic 1 also depicts the various loadout facilities, which are described below.

[*Remainder of this page intentionally left blank.*]



7.     At the Cambrian Facilities, the Debtors use coal preparation plants to wash coal of soil and rock and sort it into graded pieces for shipment to the market.  Shipment to the market is accomplished through various loadout and handling facilities located at or near rail lines operated by Class I railroads, whereby coal is loaded onto coal cars and transported by locomotive to the Debtors' customers.  Additionally, the Debtors perform loadout by location-to-location trucking and over-the-road trucking, among other means of transportation to the market.  Coal extracted, cleaned, marketed, and shipped at the Cambrian Facilities consists of metallurgical, industrial, and thermal coals.  Metallurgical coal is almost exclusively used to produce high-grade coke, a major component of steelmaking.  Thermal coal, as the name implies, is used for power or heat generation.  Industrial coal is used in ferrous alloy production, carbon filtration, and steam production for many industrial plants.  Therefore, the Debtors' operations and profits depend heavily upon the demand of volatile markets.

8.     The Debtors employ a significant number of residents from the Appalachian regions of eastern Kentucky and western Virginia.  As of the Petition Date, the Debtors employed approximately 662 employees across the Cambrian Facilities.  The total number of the Debtors' employees fluctuates at any given time due to market and other conditions.  Generally, the Debtors employ approximately: (i) 261 employees at Perry County Coal; (ii) 82 employees at Premier Elkhorn; (iii) 67 employees at Clintonwood Elkhorn; and (iv) 90 employees at Apex.  Additionally, the Debtors have employees that provide various administrative and other functions to support the Debtors' mining operations.  The Debtors' employees may work across various Cambrian Facilities at any given time.  None of the Debtors' employees are members of a labor union and the Debtors do not have union obligations.  The Debtors' employees are further described in various First Day Motions.

B. **Corporate Structure**

9.      The Debtors' corporate structure is reflected on Graphic 2, below.  As indicated by Graphic 2, Cambrian Holding is the ultimate parent of the Debtors, except for Shelby Resources.   Ownership of Cambrian Holding consists of myself with 250 shares (100% ownership), as previously indicated.  Cambrian Holding, in turn, wholly owns Cambrian Coal LLC ("**Cambrian Coal**").   Cambrian Coal, in turn, wholly owns Apex Energy, Inc, C.W. Augering, Inc., Marshall Resources, Inc., S.T. & T. Leasing, Inc., T.C. Leasing, Inc., and PLM Holding Company LLC ("**PLM**").   PLM, in turn, wholly owns Bear Branch Coal LLC, Clintwood Elkhorn Mining LLC, Gatliff Coal LLC, Pike-Letcher Land LLC, Premier Elkhorn Coal LLC, Raven Rock Development LLC, Rich Mountain Coal LLC, and Perry County Coal LLC ("**Perry Coal**").   Perry Coal wholly owns Ray Coal LLC which, in turn, wholly owns Whitaker Coal LLC.  The ownership of Shelby Resources consists of myself with 20,625 units (100% ownership).   Prior to the Petition Date, James H.  Booth and Ted McGinnis held ownership interests in Cambrian Holding and Shelby Resources.   All of the Debtors are incorporated in Kentucky, with primary administrative offices in Belcher, Corbin, and Lexington, Kentucky.

[*Remainder of this page intentionally left blank.*]

**GRAPHIC 2:**



### C. **Debt Structure**

10.     The Debtors have approximately $300 million of liabilities, of which approximately $126 million is secured debt owed to the ABL Revolver Lenders (as defined herein) and the Term Loan Lenders (as defined herein).  Additionally, Community Trust Bank, 1st Trust Bank, Caterpillar Financial Services Corporation, Komatsu Financial Limited Partnership, Brandeis Machinery and Supply Company, Rudd Equipment, PNC Equipment Finance, LLC, Whayne Supply Company, and various taxing authorities also purport to have liens on certain equipment or assets owned by the Debtors.  The remaining balance of the Debtors' obligations is generally comprised of unsecured claims.

### i. **Secured Debt**

11.     Non-Debtors Beech Fork Processing, LLC, Eagle Coal Company, LLC and Pevler Coal Sales Company, Inc., as borrowers, and their subsidiaries, as guarantors, entered into that certain ABL Credit and Guaranty Agreement, dated as of July 10, 2013, for a $10 million asset-based revolving loan used for working capital and general corporate purposes (as amended from time to time, including the amendments described herein, the "**ABL Revolver**").  In connection with the acquisition of TECO Coal LLC and its coal operations (the "**TECO Acquisition**") by Cambrian Coal, the ABL Revolver was amended and restated as of September 21, 2015 to, among other things, remove Pevler Coal Sales Company, Inc.  as a borrower, include Debtors Cambrian Coal and Shelby Resources as borrowers, include the subsidiaries of Debtor Cambrian Coal as guarantors, and increase the size of the ABL Revolver to up to $47.5 million.

12.     The additional ABL Revolver proceeds made available on September 21, 2015 were used to cash collateralize certain bonding obligations arising in connection with the TECO Acquisition and for working capital and general corporate purposes.  Deutsche Bank AG New

York Branch serves as administrative agent and collateral agent (the "**ABL Revolver Agent**")
for the ABL Revolver and the ABL Revolver lenders are the ABL Revolver Agent, in its
capacity as a lender, and Richmond Hill Investment Co., L.P.  (collectively, the "**ABL Revolver**
**Lenders**").

13.    The ABL Revolver is secured by a senior or junior lien, as applicable, on
substantially all the assets of non-Debtors Beech Fork Processing LLC and Eagle Coal
Company, LLC, and Debtors Cambrian Coal and Shelby Resources, along with their respective
subsidiaries, other than certain excluded assets, such as collateral accounts, real property not
considered material, agreements that prohibit the granting of liens without consent of the
counterparty, and other customarily excluded assets.   Subsequently, the borrowers, the
guarantors, the ABL Revolver Agent and the ABL Revolver Lenders entered into various
forbearance and related agreements in response to defaults arising from challenging coal market
conditions (collectively, the "**ABL Forbearance Agreements**").   As part of those ABL
Forbearance Agreements, non-Debtors Southeastern Land, LLC and Miller Creek Holdings,
LLC granted the ABL Revolver Agent, for the benefit of the ABL Revolver Lenders, liens on
certain mining equipment and the equity interests in Miller Creek Holdings, LLC (who holds a
note receivable) to secure the ABL Revolver.  Currently, all forbearance periods have expired
under the ABL Forbearance Agreements.  As of the Petition Date, approximately $48 million is
outstanding on the ABL Revolver.

14.    In addition, non-Debtors Beech Fork Processing, LLC, Eagle Coal Company,
LLC and Pevler Coal Sales Company, Inc., as borrowers, and their subsidiaries, as guarantors,
entered into a Credit and Guaranty Agreement, dated as of July 10, 2013, for a $43.5 million

term loan used for working capital and general corporate purposes (as amended from time to time, including the amendments described herein, the "**Term Loan**").

15.     In connection with the TECO Acquisition, the Term Loan was amended and restated as of September 21, 2015 to, among other things, remove non-Debtor Pevler Coal Sales Company, Inc. as a borrower, include Debtors Cambrian Coal and Shelby Resources as borrowers, include the subsidiaries of Debtor Cambrian Coal as guarantors, and increase the size of the Term Loan to approximately $52 million.

16.     The additional Term Loan proceeds made available on September 21, 2015 were used to repay certain indebtedness, to pay certain fees, costs and expenses incurred in connection with the TECO Acquisition, and for working capital and general corporate purposes. Deutsche Bank Trust Company Americas serves as administrative agent and collateral agent (the "**Term Loan Agent**") for the Term Loan and the Term Loan lenders are Deutsche Bank AG, London Branch, Tennenbaum Opportunities Partners V, LP and Tennenbaum Opportunities Fund VI, LLC (collectively, the "**Term Loan Lenders**"). The Term Loan is allegedly secured by a lien on substantially the same assets of non-Debtors Beech Fork Processing, LLC and Eagle Coal Company, LLC, Debtors Cambrian Coal and Shelby Resources, and their respective subsidiaries as secure the ABL Revolver. Subsequently, the borrowers, the guarantors, the Term Loan Agent and the Term Loan Lenders entered into various forbearance and related agreements in response to defaults arising from challenging coal market conditions (collectively, the "**Term Loan Forbearance Agreements**"). As part of the Term Loan Forbearance Agreements, non-Debtors Triple A Resources, Inc., R & J Development Company, LLC, Southeastern Land, LLC and its subsidiary, Miller Creek Holdings, LLC, granted the Term Loan Agent, for the benefit of the Term Loan Lenders, liens on certain commercial development property, mining equipment and

the equity interests in Miller Creek Holdings, LLC (who holds a note receivable) to secure the Term Loan.  Currently, all forbearance periods under the Term Loan Forbearance Agreements have expired.  As of the Petition Date, approximately $78 million is outstanding on the Term Loan.

17.    The ABL Revolver Agent and the Term Loan Agent are parties to an Amended and Restated Intercreditor Agreement dated as of September 21, 2015 (as amended, restated or otherwise modified from time to time, the "**Intercreditor Agreement**"), which was acknowledged by the obligors under the ABL Revolver and the Term Loan.  The Intercreditor Agreement sets forth the relative lien priority and payment rights as between the ABL Revolver and the Term Loan.  The Intercreditor Agreement also provides that (a) if the agent holding the senior lien on any shared collateral releases its lien in connection with a disposition of that shared collateral, the agent holding the junior lien is deemed to consent to, and will release its lien with respect to, the disposition of that shared collateral, provided that disposition meets certain criteria set out in the Intercreditor Agreement, and (b) the agent holding the junior lien on any shared collateral will be deemed to have consented to the use of such shared collateral that constitutes cash collateral or any debtor-in-possession financing and will subordinate its liens on such shared collateral to the debtor-in-possession financing liens on such shared collateral, any adequate protection made available to the agent holding the senior lien on such shared collateral, and any professional fee and U.S.  trustee fee carveout consented to in writing by the agent holding the senior lien, provided that the agent with the senior lien on such shared collateral does not oppose or object to such use or financing and such use or financing meets certain criteria set out in the Intercreditor Agreement.

18.     In connection with the ABL Forbearance Agreements and the Term Loan Forbearance Agreements referenced above, the Intercreditor Agreement was amended to set out the lien priority rights with respect to the additional collateral provided to the ABL Revolver Agent and the Term Loan Agent by non-Debtors Triple A Resources, Inc., R & J Development Company, LLC, Southeastern Land, LLC and its subsidiary, Miller Creek Holdings, LLC.

**ii.     Unsecured Debt**

19.     As of the Petition Date, the Debtors owe unsecured obligations in amounts that will be disclosed in the Debtors' Schedules and Statements of Financial Affairs when filed with this Court.

**II.     CIRCUMSTANCES GIVING RISE TO THESE CHAPTER 11 CASES**

**A.  The TECO Acquisition and Declining Performance Leading to Liquidity Issues**

20.     In 2015, pursuant to the TECO Acquisition, the Debtors acquired Perry County Coal, Premier Elkhorn, and Clintwood Elkhorn.  The TECO Acquisition required the Debtors to cash collateralize bonding obligations in excess of $40,000,000 for workers' compensation and black lung liabilities that TECO had previously self-insured (an option not available to the Debtors) and obligated the Debtors to pay, upon certain specified conditions and contingencies, up to $60,000,000 to TECO over four years.[2]  In connection with the TECO Acquisition, the Debtors undertook a significant capital raising effort to place cash back on the Debtors' balance sheet to provide liquidity.  The Debtors' attempts to raise liquidity were hampered by a significant downturn in the market as a result of various factors (as briefly discussed below). While the TECO Acquisition effectively doubled the size of the Debtors, due to the inability of

---

[2] The $60,000,000 contingency payment amount was later reduced by agreement to $19 million.  The full amount remains outstanding.  Cambrian missed the first payment in the amount of $3 million on March 31, 2019 and TECO recently filed suit to collect the same.

the Debtors to increase their liquidity, the Debtors were unable to meet working capital requirements which led to liquidity challenges.

21.     The North American coal industry is intensely competitive and over the past several years, market forces in the industry have affected a number of coal companies, many of which have filed for chapter 11.   While the metallurgical coal market has been favorable over the past 24 months, general distress affecting the domestic U.S.  thermal coal industry has produced a sustained low-price environment.  In addition, coal mining requires a high level of capital expenditure to sustain production and to maintain safety requirements.

22.     Although Cambrian previously targeted a total of 4.2 million tons in production in 2018, lack of capital caused actual production to be only 2.8 million tons.  This diminished production and sales volume has severely limited the Debtors' liquidity and has exacerbated production issues in 2019 and prevented the Company from implementing planned capital improvements.

23.     With production and related costs significantly higher than expected and thermal coal prices significantly lower than expected, the Debtors experienced significant decreases in cash flow over several years.  The liquidity crunch triggered financial covenant and other defaults under the ABL Revolver and the Term Loan and the Debtors' inability to service the ABL Revolver and the Term Loan. While the Debtors' revenues increased after the TECO Acquisition, from $131,722,798 in 2015 to $272,302,958 in 2017, revenues decreased in 2018 to $228,470,375.  The Debtors have recorded net losses for 2015, 2016, 2017, and 2018.

**B.   Efforts to Restructure and the Filing of These Chapter 11 Cases**

24.     After the TECO Acquisition, the Debtors undertook various efforts to return to a positive cashflow, including:  (i) to the extent possible and economically feasible, engaging in optimal downsizing strategies, such as (x) idling or closing certain mining operations and

extending the life of service equipment and (y) reducing the Debtors' labor costs, including a limited number of layoffs and wage decreases; (ii) entering into the ABL Forbearance Agreements and the Term Loan Forbearance Agreements with the ABL Revolver Lenders and the Term Loan Lenders, respectively, to allow the Debtors to sell their assets as a going concern, locate replacement or mezzanine financing, raise capital, or engage in another financially-viable transaction; and (iii) retaining Jefferies LLC ("**Jefferies**") to assist the Debtors with potential capital raising and M&A opportunities.

25.     Between 2015 and the Petition Date, the Debtors idled their operations at the E41 Mine at Perry Coal and several surface mines and deep mining complexes at both Premier Elkhorn and Clintwood Elkhorn.  The idling and closing of these operations resulted in cost savings but, unfortunately, the operations continued to generate losses due to ongoing reclamation and other maintenance costs.   The Debtors' idled or closed mining complexes were not profitable and had no reasonable prospect of becoming profitable.   The Debtors also negotiated with the ABL Revolver Lenders and the Term Loan Lenders to obtain a standstill on servicing the ABL Revolver and the Term Loan pursuant to the terms of the ABL Forbearance Agreements and the Term Loan Forbearance Agreements, respectively, throughout 2016 and 2017.

26.     Notwithstanding these efforts, the Debtors have been unable to overcome the pressures placed on their profit margins from steadily declining coal prices (along with burdensome regulations and the accompanying decline in demand for coal), all of which have contributed to the Debtors' substantial negative cashflow and inability to consummate a value-enhancing transaction.

27.     Furthermore, on April 26, 2019, the Term Loan Agent obtained a restraining order from the Lawrence Circuit Court in civil action No.  19-CI-00004, *Deutsche Bank Trust Company v.  R&J Development, et al*, against non-Debtors Beech Fork Processing, LLC, Eagle Coal Company, LLC and Southeastern Land, LLC and Debtors Cambrian Coal and Shelby Resources and their respective subsidiaries.  The restraining order prohibited these companies from making use of the collateral in which the Term Loan Lenders asserted a first priority lien, effectively prohibiting the Debtors from operating.  The restraining order was converted to a temporary injunction by order entered by the Court on May 9, 2019, and the Court permitted the filing of an amended complaint adding the subsidiaries of the original defendants and certain other affiliates to the civil action.  On May 24, 2019, the Court granted the Term Loan Agent's motion for a Writ of Possession as to a subset of the collateral, primarily consisting of light duty trucks and other vehicles.  Each of the defendants, other than non-Debtors Triple A Resources, Inc.  and R & J Development Company, filed a motion to dismiss the Amended Complaint.  The Debtor defendants subsequently withdrew their motion.

28.     In early June 2019, with cash at a minimum and no further opportunities to enhance liquidity, Richmond Hill Capital Partners, LP agreed to provide emergency financing to fund professional fees and working capital needs necessary to enable the Debtors to prepare for an orderly chapter 11 filing.  Accordingly, in early June 2019, the Company entered into the "Fifth Amendment Loan" to permit the funding of $500,000 which was funded to the Debtors on June 7, 2019.

29.     After an extensive and deliberate process, the Debtors have determined in their business judgment that the commencement of these chapter 11 cases is the best course to preserve and maximize liquidity and value for their stakeholders.

30.    The Debtors believe that the relief provided by chapter 11 will enable them to commence an expeditious sale and marketing process for substantially all of the Debtors' assets. To that end, the Debtors anticipate filing a motion to establish bidding and sale procedures for substantially all of the Debtors' assets shortly after the Petition Date, providing value for their stakeholders.

## III.    First Day Motions and Applications[3]

31.    Concurrently with the filing of the Chapter 11 Cases, the Debtors filed the First Day Motions requesting various forms of relief.  Generally, the First Day Motions have been designated to meet the goals of: (a) preserving and protecting the Debtors' chapter 11 estates, including by paying certain claims of employees, essential suppliers, lienholders and vendors; (b) obtaining necessary debtor in possession financing to provide the Debtors' estates with sufficient liquidity to operate; and (c) establishing procedures for the smooth and efficient functioning of the Debtors' estates.  I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to reorganize successfully.

## A.  MOTION FOR ENTRY OF AN ORDER PURSUANT TO RULE 1015(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING JOINT ADMINISTRATION OF THE DEBTORS' CHAPTER 11 CASES

32.    The Debtors will present a motion requesting the entry of an order providing for the joint administration, but not the substantive consolidation, of the Chapter 11 Cases.  I believe that the joint administration of the Debtors' respective estates is warranted and will promote efficiency.

---

[3] In this Section III, capitalized terms used herein but undefined shall have the meanings ascribed to them in the First Day Motions or Applications, as applicable.

33.     Given the integrated nature of the Debtors' operation, specifically, the fact that the Debtors share common ownership, share resources and management systems, and the Debtors will be borrowers and/or guarantors under the Debtors' anticipated post-petition financing facility, joint administration of the motions, hearings, and orders in the Chapter 11 Cases will affect each and every Debtor entity.   Accordingly, I submit that the joint administration of these Chapter 11 Cases is in the best interests of their creditors and all other parties in interest.

**B. MOTION FOR EXTENSION OF TIME FOR THE FILING OF SCHEDULES AND STATEMENTS OF FINANCIAL AFFAIRS**

34.     Because of the size and complexity of the Debtors' businesses and financial affairs, the Debtors will move for entry of an order granting them an extension of time until 30 days following the Petition Date to gather information necessary to complete and file the required: (a) schedules of assets and liabilities; (b) schedules of executory contracts and unexpired leases; and (c) statements of financial affairs.  I believe this will assist in the general administrative efficiency of these Chapter 11 Cases and allow the Debtors to immediately begin maximizing value for the Debtors' creditors.

**C. MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY AND HONOR CERTAIN PREPETITION CLAIMS FOR WAGES, SALARIES, BONUSES AND OTHER COMPENSATION AND WITHHOLDINGS AND DEDUCTIONS; (B) CONTINUE EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE OF BUSINESS; AND (C) PAY CERTAIN REIMBURSABLE EXPENSES; (II) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO MAKE DEDUCTIONS FROM EMPLOYEE PAYCHECKS; AND (III) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR AND PAY ALL CHECKS PRESENTED FOR PAYMENT AND ELECTRONIC PAYMENT REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING**

35.     The Debtors employ approximately 662 employees (the "**Employees**"), most of whom are based in Kentucky. The Employees include approximately 80 salaried Employees and

582 hourly Employees. The Debtors also have agreements with four independent contractors (the "**Independent Contractors**") who serve in various administrative roles.

36.    The Employees performed a variety of critical functions, including overseeing and performing the Debtors' coal mining and processing operations during the prepetition period, which added significant value to the Debtors' estates. The Employees' skills, knowledge and understanding of the Debtors' infrastructure and operations are essential to maintain and maximize the value of the Debtors' assets and business.

37.    To minimize the personal hardship that the Employees will suffer if prepetition employee-related obligations are not paid when due or as expected and to maintain morale of the Employees during the Chapter 11 Cases, the Debtors hereby seek authority, in their discretion, to pay and honor certain prepetition claims for, among other items, wages, salaries, and other compensation, Reimbursable Expenses (as defined herein), federal and state withholding taxes and other amounts withheld (e.g., garnishments, child support, Employees' share of insurance premiums, taxes and 401(k) contributions), Employees' health benefits, insurance benefits, flexible spending and/or health savings accounts, workers' compensation benefits, vacation time, paid leave, jury duty leave, life insurance, short-term disability coverage and other Employee benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "**Employee Wages and Benefits**"), and to pay all fees and costs incident to the foregoing, including amounts to third-party administrators or other administrative service providers. In addition, the Debtors seek authority to modify, change and discontinue any of the Employee Wages and Benefits, and to implement new Employee Wages and Benefits in the ordinary course of business during these chapter 11 cases, in their discretion, without the need for further Court approval.

38.     Finally, the Debtors request that banks and other financial institutions be authorized and directed to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing. The Debtors also seek authority to issue new postpetition checks or fund transfer requests with respect to prepetition obligations that may have been dishonored by the banks in respect of the Employees' prepetition wages, benefits and deductions, if necessary.

39.     I believe that paying prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, I believe that without the relief requested herein, employees may seek immediate alternative employment opportunities. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and, likely, diminishing recoveries for stakeholders. The loss of valuable employees and resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time. There can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor certain wage, benefits, and related obligations, including certain of the prepetition Employee Wages and Benefits. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve this motion.

40.     By this motion, the Debtors seek entry of an order authorizing the Debtors to pay prepetition amounts outstanding on account of Employee Compensation and Benefits, in the aggregate amount of $1,637,000 for the Debtors' previous payroll period, plus approximately $1,016,000 in Employee Compensation and Benefits for the Debtor's upcoming payroll period.

**D. MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING PAYMENT OF CERTAIN PREPETITION TAXES AND DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION SALES, USE, AND PRODUCTION TAX OBLIGATIONS**

41.     The Debtors, in the ordinary course of the Debtors' businesses, the Debtors collect, withhold, and incur and pay: (i) Production Taxes, (ii) Coal Excise Taxes, (iii) Environmental and Safety Fees and Assessments, (iv) Sales & Use Taxes, (v) Franchise Taxes and Fees, (vi) Unmined Minerals Taxes and other Property Taxes, and (vii) Other Taxes (collectively, the "**Taxes**").  The Debtors remit the Taxes to various federal, state and local governments, including taxing and licensing authorities (collectively, the "**Governmental Authorities**").

42.     The Debtors incur production taxes and fees (including severance taxes, reclamation taxes and fees, and workers compensation pneumoconiosis taxes) related to the extraction of coal ("**Production Taxes**") pursuant to federal law and the laws of Kentucky.[4]  As of the Petition Date, the Debtors have accrued but not remitted approximately $720,500 in Production Taxes due to the Commonwealth of Kentucky, approximately $53,000 in Production Taxes due to the Commonwealth of Virginia, and approximately $85,000 in Production Taxes due to the federal government.

43.     The Debtors incur excise taxes pursuant to section 4121 of the Internal Revenue Code ("**Coal Excise Taxes**").  The Debtors remit these taxes on a semimonthly basis.  As of the Petition Date, approximately $16,800[5] in Coal Excise Taxes had been incurred by the Debtors

---

[4] The Debtors also incur taxes based on or measured by their net income (including, but not limited to, the federal corporate income tax and state income and franchise taxes).  This Motion does not pertain to such taxes.

[5] This amount includes actual accrued and unpaid taxes through June 11, 2019.

and not yet remitted to the relevant Governmental Authority. The Debtors will owe an addition $25,000 in Coal Excise Taxes on June 28, 2019, to the relevant Governmental Authority.

44.    The Debtors do not believe that they are subject to any fees, penalties, or assessments to comply with environmental, health and safety laws and regulations ("**Environmental and Safety Fees and Assessments**") that are required to be remitted to any Governmental Authorities on a periodic basis. However, subject to the DIP Facility, the Debtors generally intend to pay to the appropriate Governmental Authorities any such Environmental and Safety Fees and Assessments as the Debtors, in their sole discretion, deem appropriate to ensure their continued receipt and renewal of permits and other authorizations necessary for the continuation of their businesses and pursuant to any applicable law or regulation, including, without limitation, the Surface Mining Control and Reclamation Act and corresponding state and local laws.

45.    The Debtors collect or incur various general use taxes ("**Use Taxes**"). The Debtors are required to remit these Use Taxes to the applicable Governmental Authorities on a periodic basis. Debtors currently owe approximately $40,400 of Use Taxes to the applicable Governmental Authorities. Subsequent to the approval of this Motion and subject to the DIP Facility, the Debtors may, in their sole discretion, pay this outstanding prepetition liability and any Use Taxes that arise after the Petition Date to the applicable Governmental Authorities as they become due.

46.    The Debtors also collect, withhold or incur state and local taxes imposed on overall gross receipts, commercial activity taxes, business license fees and various other federal, state or local taxes, charges, fines, penalties and fees (including, without limitation, any amounts required to be withheld, incurred or collected under applicable law) ("**Other Taxes**"). The

Debtors are required to remit these Other Taxes to the relevant Governmental Authorities on a periodic basis.

47.     The Debtors have property tax obligations to certain Governmental Authorities for their real and personal property holdings, including, without limitation, unmined minerals tax obligations ("**Property Taxes**").  As of the Petition Date, the Debtors owe $293,978 in real property taxes to certain Governmental Authorities for the year 2018.  As of the Petition Date, the Debtors are liable for Unmined Mineral Taxes in the amount of approximately $1,102,211.[6] Additionally, as of the Petition Date, the Debtors are liable for personal property taxes in the amount of approximately $1,043,105 for the year 2018.  The Debtors' current practice generally is to pay such amounts to the appropriate Governmental Authorities on various dates during the year, and no later than when they become due.

48.     The Debtors seek entry of interim and final orders: (i) authorizing, but not requiring, the Debtors, in their sole discretion, to pay the Taxes and (ii) authorizing the Banks to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Taxes.

49.     The Debtors believe that many of the Taxes collected prepetition are not property of the Debtors' estates and must for that reason be turned over to the Governmental Authorities. To the extent that they are not actually the property of the Governmental Authorities, they may well give rise to priority claims.  Moreover, the Debtors also seek to pay Taxes in order to forestall the Governmental Authorities from taking actions that might interfere with the Debtors' businesses, such as blocking the receipt or renewal of permits required for the Debtors' continued operations or possibly bringing personal liability actions against directors, officers and

---

[6] This amount includes $349,942.02 from an installment agreement for amounts owed from 2017.  The Debtors may have certain obligations for Unmined Mineral Taxes assessed against third parties who are counterparties to certain leases with the Debtors.  To the extent the Debtors have any such outstanding prepetition obligations, the Debtors will address them through the lease assumption or claims resolution process during these Chapter 11 Cases.

other employees in connection with non-payment of the Taxes. Actions against the Debtors'
directors, officers and other employees would likely distract key personnel, whose full-time
attention to the Chapter 11 Cases is required, and would likely cause potential business
disruptions. Any such business disruptions would likely erode the Debtors' customer base and
negatively affect the Chapter 11 Cases. Accordingly, the Debtors submit that the proposed relief
is in the best interest of the Debtors' estates.

### E. MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS

50.     In the ordinary course of business, the Debtors make payments to certain essential
trade vendors, contract miners, and service providers (the "**Critical Vendors**") on a regular
basis. If the Critical Vendors are not paid, their unwillingness to continue to service the Debtors
could cause an interruption of the Debtors' businesses. Such interruption could have drastic
consequences for the operations of the Debtors' businesses due to the lack of alternative
suppliers or service providers in many situations, or the amount of time needed to locate and
convert to alternative sources. Such interruption also could negatively affect the Debtors'
revenue and further strain the Debtors' liquidity.

51.     The Debtors have reviewed their business relationships and identified vendors,
the loss of whose particular goods or services would cause immediate and irreparable harm to the
Debtors' businesses. In identifying Critical Vendors, the Debtors considered the following three
(3) general criteria: (a) whether the Debtors' customers require them to use the particular vendor;
(b) whether the vendor would be prohibitively expensive or time-consuming to replace, such as
where the Debtors' existing inventory, equipment, or manufacturing processes are specifically
tailored to that vendor's products or services; and (c) whether the vendor is a sole-source or
limited-source supplier of goods or services of the quality and quantity required by the Debtors

in a particular market, without whom the Debtors could not continue to operate without disruption.  The Debtors also considered the financial condition of their vendors and service providers to the extent such information was known, including each vendor's or supplier's level of dependence on the Debtors' continued business and whether such vendor or supplier is itself financially distressed.

52.    The Critical Vendors provide various products, services and goods essential to the Debtors' businesses, including, but not limited to, contract mining bonding, engineering, laboratory/quality analysis, and parts suppliers.  If required, the Debtors will provide a schedule of Critical Vendors to the Court, the United States Trustee for the Eastern District of Kentucky, Richmond Hill Capital Partners, LP, and Essex Equity Joint Investment Vehicle, LLC under seal.

53.    In the normal course of their business, the Debtors utilize and make payment to delivery services, trucking and rail transport companies, freight terminal operators, transloaders, shippers, and other transportation service providers (the "**Shippers**" and, their claims, the "**Shippers Claims**" and, together with the Critical Vendor Claims, the "**Obligations**") that ship, transport, store, and otherwise facilitate the movement of parts, materials, and other goods used in the Debtors' operations.  The services provided by the Shippers are essential to the Debtors' day-to-day operations as the Debtors rely on the Shippers to transport coal from the mines to preparation plants and from the preparation plants to dock and rail terminals.  In many cases, the Shippers are irreplaceable and represent the only means to transport the Debtors' goods.  For example, the Debtors' business depend critically on their relationships with several trucking and rail transport companies for which there are no adequate or available substitutes in the market.  The Debtors also rely heavily on operators of key dock and rail terminals, many of which represent the only practicable method of accessing and transporting the Debtors' goods.  The

inability to locate suitable replacements for these and similar Shippers would result in the Debtors' mining operations coming to an immediate halt.

54.     The continued availability of trade credit in amounts and on terms consistent with those that the Debtors enjoyed prepetition is necessary for the Debtors to maintain liquidity for operations and preserve the customer base and vendor network that is essential to the Debtors' efforts to maximize the value of their estates.  The Debtors believe that preserving working capital through the retention or reinstatement of Customary Trade Terms will enable the Debtors to maintain their competitiveness and to maximize the value of their businesses.  Conversely, a deterioration of trade credit and disruption or cancellation of deliveries of goods and services would hinder the Debtors' operations and undermine their ability to generate revenue and ultimately to maximize the value of these estates.

55.     In sum, the failure to pay prepetition claims owed to Critical Vendors and Shippers could critically damage the Debtors, their estates, their creditors and other parties in interest and undermine the prospects for a successful emergence from chapter 11.  Without customary trade credit terms, the Debtors could lose an inexpensive and existing source of financing.  Indeed, failure to pay Critical Vendor Claims and Shippers Claims may result in Critical Vendors ceasing to do business with the Debtors altogether. The Debtors seek authorization to pay, in their discretion, the Obligations in the amount of up to $6,350,000 on an aggregate basis.

## F.  DEBTORS' EXPEDITED MOTION FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO: (A) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION; AND (B) MAINTAIN POST-PETITION FINANCING OF INSURANCE PREMIUMS

56.     In the ordinary course of their businesses, the Debtors maintain numerous insurance policies that provide coverage for, among other things, property and equipment

damage, business interruption, commercial general liability, business automobile liability, pollution liability, umbrella liability, directors' and officers' liability, fiduciary liability, crime, and personal property (collectively, as described in the relevant motion, the "**Insurance Policies**").

57.     The Debtors' Policies require payment of the entire applicable premium at the inception of the applicable coverage period (the "**Financed Policies**").  It is not always in the Debtors' best interests, however, to pay its full insurance premiums up front.  Accordingly, in the ordinary course of business, the Debtors finance the premiums on the Financed Policies pursuant to premium financing agreement with Western Commerce Bank ("**Financing Agreement**").

58.     The Debtors request that the banks and financial institutions on which checks were drawn, or electronic payment requests were made, in payment of prepetition obligations approved herein be authorized and directed to receive, process, pay, and honor all such checks and electronic payment requests presented for payment, and all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved.

59.     The Financed Policies are essential to the preservation of the value of the Debtors' businesses, properties and assets.  In many cases, insurance coverage such as that provided by the Financed Policies is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities.

### G. MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER UNDER 11 U.S.C. §§ 105(A) AND 366 (I) PROHIBITING UTILITIES FROM DISCONTINUING, ALTERING, OR REFUSING SERVICE, (II) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCES OF PAYMENT, AND (III) ESTABLISHING PROCEDURES FOR UTILITIES TO OPT OUT OF THE DEBTORS' PROPOSED PROCEDURES FOR ADEQUATE ASSURANCE

60.    In operation of their facilities, the Debtors incurs utility expenses for, among other things, water, electricity, internet, and telephone services in the ordinary course of business. These utility services are provided by approximately twenty-three (23) providers (collectively, the "**Utility Providers**").  Based on a historical average over the last twelve months, the Debtors spend approximately $1,072,087.01 each month on utility costs.  As of the Petition Date, approximately $971,769.92 in utility costs is outstanding.

61.    Uninterrupted utility services are essential to the Debtors' ongoing business operations and, therefore, to the success of their chapter 11 efforts.  Should the Utility Providers refuse or discontinue service to the Debtors' facility, even for a brief period, the Debtors' business operations would be severely disrupted.  Simply put, without utility service, the Debtors' operations will shut down.  Continuity of services is particularly critical in this case because the Debtors have a substantial coal mining and processing operation that relies on various utilities for continued operation.  Failure to maintain continuous operations will inevitably harm the Debtors and their estates as well as seriously jeopardize the Chapter 11 Cases.  It is, therefore, critical that utility services continue uninterrupted.

62.    I understand that, pursuant to section 366(c)(2) of the Bankruptcy Code, a utility provider may alter, refuse, or discontinue a chapter 11 debtor's utility service if the utility does not receive from the debtor or the trustee adequate "assurance of payment" within 30 days of the commencement of the debtor's chapter 11 case.  To comply with the requirements of section 366 of the Bankruptcy Code, the Debtors seek an order of this Court authorizing them to provide a

deposit to any requesting Utility Provider (each, an "**Adequate Assurance Deposit**") in an amount equal to the Debtors' calculation of the cost of two weeks' worth of utility service, based on recent historical averages *provided* that such Utility Providers are not currently paid in advance for its services and/or do not already hold a deposit equal to or greater than the Adequate Assurance Deposit (which existing deposit shall be deemed to be the Adequate Assurance Deposit).    The aggregate amount of the proposed available Adequate Assurance Deposits is approximately $50,000.

### H. MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO CONTINUE AND RENEW THEIR SURETY BOND PROGRAMS

63.    In the ordinary course of the Debtors' businesses, the Debtors are required to provide surety bonds (collectively, the "**Surety Bonds**") to various third parties to secure the Debtors' payment or performance of certain obligations (the "**Surety Bond Program**").    In particular, the Debtors commonly (although not exclusively) provide Surety Bonds to governmental units or other public agencies pursuant to statutory requirements.    The Debtors provide Surety Bonds to secure obligations to various entities, including municipalities, state and federal regulatory agencies, customers, and suppliers.    As of the Petition Date, the Debtors had approximately $167,000,000 in outstanding Surety Bonds. The Debtors pay approximately $3,800,000 in annual premiums on account of the Surety Bonds and the Debtors owe approximately $189,000 in outstanding premiums.

64.    To secure their obligations under the Surety Bonds, the Debtors have generally posted collateral with the applicable issuers.    Certain issuers have required that the Debtors post no cash collateral at all or as much as 90% of the face amount of the bonds. In the aggregate, the Debtors have provided cash collateral in an amount of approximately $43,750,000 in support of their Surety Bonds.

65.     Approximately $115,000,000 in aggregate amount of Surety Bonds has been provided by the Debtors to various governmental authorities and agencies to secure certain reclamation obligations of the Debtors in relation to their mining operations, especially those operations that are surface mining operations (collectively, the "**Reclamation Bonds**").  Other categories of Surety Bonds issued on behalf of the Debtors from time to time may include court bonds, custom bonds, financial guarantee bonds, license permit bonds, oil and gas bonds, performance bonds, workers' compensation bonds, black lung bonds and wage bonds.

66.     The Debtors pay premiums for the Surety Bonds, which premiums generally are determined annually and are paid by the Debtors to the issuers of the Surety Bonds at issuance and annually thereafter.

67.     To secure their obligations under the Surety Bonds, the Debtors have entered into a number of such indemnity agreements (the "**Indemnity Agreements**").  Pursuant to the Indemnity Agreements, the Debtors have agreed to indemnify certain parties from any loss, cost, damage or expense they may incur by reason of their execution of any bonds.

68.     It is essential to the Debtors' operations that they maintain their Surety Bond Program on an ongoing and uninterrupted basis.  The non-payment of obligations under the Surety Bond Program could result in one or more of the Issuers attempting to terminate, declining to renew or refusing to enter into Surety Bonds with the Debtors in the future.  If any Surety Bonds lapse without renewal, or if the Debtors are unable to obtain new Surety Bonds for certain purposes, the Debtors could default on various obligations, which could severely disrupt the Debtors' operations and impair the Debtors' prospects for a successful reorganization to the detriment of all parties in interest.  Moreover, the inability to secure a Surety Bond may require the Debtors to purchase insurance coverage at greater expense to the Debtors' estates.

69.    Furthermore, the Debtors may need additional bonding capacity not currently provided under the Surety Bond Program to provide financial assurances to third parties that are required for the Debtors to continue business operations during the Chapter 11 Cases.    The inability to secure a surety bond may require the Debtors to purchase insurance coverage at greater expense to the Debtors' estates.    Accordingly, to operate their businesses, the Debtors must maintain their Surety Bond Program, including by renewing or replacing, as necessary, existing Surety Bonds and maintaining collateral arrangements similar to those currently in place.

**I. MOTION OF DEBTORS FOR ENTRY OF AN INTERIM AND FINAL ORDERS: (I) AUTHORIZING POST-PETITION SECURED FINANCING PURSUANT TO SECTIONS 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 503(b) OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE; (III) PROVIDING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, AND 363 OF THE BANKRUPTCY CODE; (IV) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTION 362(d) OF THE BANKRUPTCY CODE; (V) SCHEDULING A FINAL HEARING; AND (VI) PROVIDING RELATED RELIEF**

70.    There are a number of creditors who assert an interest in the Debtors' cash collateral (the "**Cash Collateral Creditors**"), including the Term Loan Lenders and the ABL Revolver Lenders.    The Debtors have an immediate need to use cash collateral to pay actual, necessary, ordinary course operating expenses, as set forth in the DIP Budget, which includes the costs and expenses associated with the continuation of the Debtors' businesses and to maximize the value of the Debtors' assets for a proposed sale process.

71.    Absent the use of the Cash Collateral, the Debtors will be unable to operate their businesses as contemplated after the Petition Date and to meet all of their ongoing obligations. Approval of interim use of the Cash Collateral thus is crucial, and without such use, the Debtors'

operations, its creditors and other parties in interest will suffer immediate and irreparable harm and its assets will markedly diminish in value going forward.

72.    In consideration for the post-petition use of the prepetition collateral, to the extent that any Cash Collateral Creditors assert rights to adequate protection, the Debtors propose to protect the interests of those Cash Collateral Creditors with replacement liens and periodic cash payments.

73.    As for the need for post-petition financing, the Debtors have attempted to obtain post-petition financing proposals from a number of lenders, but were unable to obtain post-petition financing on an unsecured basis.

74.    Before deciding to obtain post-petition financing from the DIP Lenders, the Debtors and the DIP Lenders engaged in arm's length, good faith negotiations, each with separate and independent counsel experienced in matters of finance and bankruptcy law.  The Debtors were unable to obtain proposals for post-petition financing on terms and conditions more favorable to the Debtors' estates than those set forth in the DIP Term Sheet or the DIP Orders.

75.    Accordingly, the Debtors have determined, in the exercise of their best and reasonable business judgment, that the financing to be provided by the DIP Lenders is the most favorable funding available under the circumstances and addresses the Debtors' immediate necessary financing needs during these Chapter 11 Cases.  The financing available under the DIP Term Sheet and the DIP Orders will enable the Debtors, among other things, to avoid the cessation of its operations, maintain the continuity of its operations, and maximize the value of its business.

**J. MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) APPROVING CONTINUED USE OF EXISTING CASH**

**MANAGEMENT SYSTEM, (II) AUTHORIZING USE OF PREPETITION BANK ACCOUNTS AND BUSINESS FORMS, (III) WAIVING CERTAIN REQUIREMENTS OF THE UNITED STATES TRUSTEE, AND (IV) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(B)**

**a. The Debtors' Request for Authority to Continue Using the Debtors' Existing Cash Management System**

76.     In the ordinary course of business, the Debtors maintain forty-four (44) bank accounts, (collectively, the "**Bank Accounts**") at Community Trust Bank and Peoples Bank and Trust Co.  (collectively, the "**Banks**").

77.     The Debtors' Cash Management System enables the Debtors to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information.  To lessen the disruption caused by the Chapter 11 Cases and maximize the value of the Debtors' estates, the Debtors believe it is essential that it be allowed to maintain its well-developed Cash Management System.  Given the general demands of the Debtors' reorganization process, it would be unduly burdensome to require the Debtors to establish an entirely new system for the management of the Debtors' cash assets.  If the Debtors are not permitted to continue to utilize the Cash Management System, its operations would be severely disrupted.  Accordingly, the Court should authorize the Debtors' continued use of the Cash Management System described herein.

78.     The Cash Management System operates as an integrated system of accounts, each of which provide well-established mechanisms for the collection, distribution, movement and management of funds used in the Debtors' business operations.

79.     The flow of cash begins with cash generated as a result of the Debtors' coal mining operations in Eastern Kentucky and Virginia.  These funds are primarily generated by three debtor entities: Clintwood Elkhorn Mining, LLC ("**Clintwood**"), Premier Elkhorn Coal

LLC ("**Premier**"), and Perry County Coal LLC ("**Perry**") (Clintwood and Premier, together with Perry, the "**Operating Entities**").  The Operating Entities mine, sell, and collect revenue on coal mined from various Debtors' mining locations.  These funds are deposited into the Operating Entities' general checking accounts, where the funds are then used to pay operational expenses of the Operating Entities or disbursed among other Debtors' accounts to sustain the Debtors' operational needs, including, but not limited to, the payment of operating expenses, payroll, administrative expenses, utilities, and royalties, as more fully described below.

80.     Apex Energy, Inc.  ("**Apex**") does not receive revenue directly from mining operations, but rather, exists to employ certain of the Debtors' employees.  Apex receives funds, as needed, to cover the payroll of certain employees working at the Debtors' mine sites.

81.     C.W.  Augering, Inc.  ("**C.W.**")  provides highwall and augering services and S.T. & T.  Leasing, Inc.  ("**S.T.  & T.**", together with C.W., the "**Pass-Through Entities**") provides trucking services for certain of the Operating Entities, who in turn disburse funds to the Pass-Through Entities to cover just the costs of the Pass-Through Entities for those services.

82.     Certain of the Debtors hold real estate interests, including leases and fee estates and related assets, including Cambrian Coal LLC, Gatliff Coal LLC (idled operation), Pike Letcher Land LLC, Shelby Resources, LLC, and T.C.  Leasing, Inc.  ("**Land Holding Entities**") The Land Holding Entities do not operate or generate any revenue, except Gatliff Coal LLC which receives limited royalties and timber income.  Since the Operating Entities may be mining on the various leasehold interests held by the Land Holding Entities, the Operating Entities disburse necessary funds to the Land Holding Entities to pay royalties, property taxes and other related expenses.

83.     Marshall Resources, Inc.  and, formerly and to a limited extent currently, PLM Holding Company LLC ("**General Admin Entities**") handle the general administrative functions for all Debtors.  The General Admin Entities handle payment of administrative costs, such as insurance, office staff payroll, etc.  and those expenses are then allocated to the appropriate Debtor and funded by the Operating Entities.

84.     The Debtors' cash management reporting and accounting functions are systematic and include the necessary accounting controls to enable the Debtors to trace funds.  The Debtors maintain necessary records for their Cash Management System that identify the current balance of their Bank Accounts.  The Debtors are also able to determine the amount of funds deposited into or withdrawn from the Bank Accounts by the Debtors and will track the expenses that are satisfied on a Debtor by Debtor basis.

85.     The Debtors must be able to continue using the Cash Management System as described above so that it can coordinate management of cash and transfers of funds to operate their business efficiently and effectively.  Any disruption in the Cash Management System could delay the collection and disbursement of funds and threaten the orderly operation of the Debtors' businesses.  Under the circumstances set forth herein, maintaining the Debtors' Cash Management System is both essential and in the best interest of the Debtors' estates and creditors.

86.     In conjunction with the authority to continue to use their Cash Management System, the Debtors request that no Bank participating in the Cash Management System that honors a prepetition check or other item drawn on any account that is the subject of this Motion (a) at the direction of the Debtors, (b) in a good faith belief that this Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite

implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored post-petition. The Debtors believe that such flexibility accorded the Banks is necessary to induce the Banks to continue providing cash management services without additional credit exposure.

      b.  **The Debtors' Request for Authority to Maintain the Debtors' Existing Bank Accounts**

87.    The United States Trustee, who administers bankruptcy cases filed in the Eastern District of Kentucky, has issued certain UST Guidelines pursuant to 28 U.S.C. § 586.  The UST Guidelines require that Chapter11 debtors, among other things, close all existing bank accounts upon filing of their petitions and open new "debtors-in-possession" accounts in certain financial institutions designated as authorized depositories by the U.S.  Trustee.

88.    The Debtors are seeking a waiver of the UST requirement that the Debtors' Bank Accounts be closed and that new post-petition bank accounts be opened.  If enforced in this case, the UST requirements would cause disruption in the Debtors' businesses.  As described above, the Debtors' Bank Accounts comprise a cash management system that the Debtors must maintain in order to ensure efficient collections and disbursements in the ordinary course of its business. Therefore, to avoid delays in paying debts incurred post-petition, the Debtors should be permitted to continue to maintain the Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.

89.    Accordingly, the Debtors request that this Court waive the strict enforcement of the requirement that the Debtors open new bank accounts.  The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and the Debtors be authorized to maintain and continue using these accounts in the same manner and with the same account numbers, styles and document form as those employed during the prepetition period.

90.     If the relief requested herein is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by this Court, I submit that the Debtors will work closely with the Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

91.     Although the Debtors seeks authorization to utilize and retain its existing checks and Bank Accounts, the Debtors will maintain their books and records so as to provide a clear line of demarcation between prepetition and post-petition transactions and operations.  If the relief requested in this motion is granted, the Debtors will not pay, and each of the Banks will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

92.     The UST Guidelines also state that disbursements other than by numbered check are prohibited.  The Debtors are seeking relief from this requirement.  The Debtors sometimes disburse funds by, among other avenues, debits, wire transfers and by initiating automated clearing house transfers.  To the extent any such transfers are done in the ordinary course of the Debtors' businesses, the Debtors are seeking permission to continue such transfers.  The Debtors will ensure that procedures are in place to track each transfer of funds, including, but not limited to, debits, wire transfers and automated clearing house transfers.

### c.  **The Debtors' Request to Use Existing Business Forms and Checks**

93.     In the ordinary course of its businesses, the Debtors use many pre-printed correspondence and business forms, including, but not limited to, checks.  The Debtors request that this Court permit the Debtors to continue using its existing pre-printed correspondence and business forms without alteration or modification.  Changing correspondence and business forms

would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' business operations. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession and brand-new correspondence and business forms would be unneeded.

94. Accordingly, the Debtors are also requesting authority to (i) continue using its correspondence and business forms to the extent that the Debtors shall manually alter and/or modify said forms with the Debtor-in-possession designation and (ii) delay the purchase and/or obtaining of new correspondence and business forms with the Debtor-in-possession designation until the existing correspondence and business forms have been completely used.

**K. APPLICATION OF DEBTORS FOR AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF EPIQ CORPORATE RESTRUCTURING, LLC AS NOTICE, CLAIMS, AND SOLICITATION AGENT EFFECTIVE, *NUNC PRO TUNC* TO THE PETITION DATE**

95. The Debtors propose to engage Epiq Corporate Restructuring, LLC ("**Epiq**") to act as the Debtors' Notice, Claims, and Solicitation Agent. The Debtors assert, and I believe, this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of these chapter 11 cases and other developments. In that capacity, Epiq will transmit, receive, docket, and maintain proofs of claim filed in connection with these chapter 11 cases.

96. By appointing Epiq as the Notice, Claims, and Solicitation Agent in these Chapter 11 Cases, the distribution of notices, the processing of claims, and the solicitation of votes will be expedited and the Clerk of the United States Bankruptcy Court for the Eastern District of Kentucky (the "**Clerk**") will be relieved of the administrative burden of processing what may be an overwhelming number of claims. The Debtors submit, and I believe, based on all engagement

proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

97.     The fees to be charged by Epiq in connection with these Chapter 11 Cases are set forth in the Services Agreement.  The Debtors respectfully submit, and I believe that Epiq's rates for its services in connection with the notice, claims processing, and solicitation services are competitive and comparable to the rates charged by their competitors for similar services. Indeed, the Debtors conducted a review and competitive comparison of other firms prior to selecting Epiq as notice, claims, and solicitation agent and, following arm's-length negotiations, determined Epiq's rates to be more than reasonable given the quality of Epiq's services and Epiq's prior bankruptcy expertise.

**L.  EXPEDITED MOTION OF DEBTORS FOR THE ENTRY OF AN ORDER (A) SCHEDULING AN EXPEDITED HEARING ON AND SHORTENING THE NOTICE PERIOD FOR THE FIRST DAY MOTIONS AND APPLICATIONS FILED BY THE DEBTORS; AND (B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF**

98.     As described in each of the First Day Motions, the relief requested in the First Day Motions filed by the Debtors is essential to maintaining the viability of the Debtors' businesses and allowing the Debtors to maximize the value of their estates, to the benefit of all parties in interest.  Accordingly, the Debtors believe that the First Day Motions involve matters that require an expedited, emergency hearing and shortened notice periods and request the Court to conduct such hearing on June 17, 2019 at 1:00 p.m., or as soon as reasonably practicable thereafter, before the Unites States Bankruptcy Court for the Eastern District of Kentucky, Second Floor Courtroom, 100 East Vine Street, Lexington, Kentucky 40507.

99.     I attest that the Debtors have given notice of the filing of the First Day Motions and the expedited hearing thereon to: (i) the Office of the United States Trustee for the Eastern District of Kentucky; (ii) the Debtors' 40 largest unsecured creditors on a consolidated basis; (iii)

Richmond Hill Capital Partners, LP and Essex Equity Joint Investment Vehicle, LLC; (iv) counsel for Richmond Hill Capital Partners, LP and Essex Equity Joint Investment Vehicle, LLC; (v) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (vi) all parties to equipment leases with the Debtors to the extent reasonably known to the Debtors; (vii) all parties asserting a surety bond interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e., Commonwealth of Kentucky, Energy and Environment Cabinet, Department of Natural Resources, Commonwealth of Kentucky, Commonwealth of Virginia, Virginia Department of Mine Minerals and Energy, Division of Mined Land Reclamation, Energy and Environment Cabinet, Division of Mine Reclamation and Enforcement, Kentucky Utilities, United States of America, Department of the Interior, Bureau of Land Management; (viii) all parties asserting a taxing interest in the assets of the Debtors to the extent reasonably known to the Debtors, i.e.  Kentucky Department of Revenue, US Department of Treasury, and US Department of Interior-Office of Surface Mining; (ix) counsel to any party in pending litigation with the Debtors; and (x) those entities specifically affected by a specific motion.  Because of the exigencies of the circumstances and the irreparable harm to the Debtors that will ensue if the relief requested herein is not granted, the Debtors submit that no other notice need be given.

100.    The Debtors have requested that service of notice on the parties stated above in the form and manner described herein be deemed adequate and appropriate under the circumstances and in full compliance with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of this Court.

### M. MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER ESTABLISHING CERTAIN NOTICE, CASE MANAGEMENT AND ADMINISTRATIVE PROCEDURES

101.    The Debtors seek entry of an order (a) authorizing the Debtors to prepare a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor.  I believe that permitting the Debtors to maintain a single consolidated list of creditors is warranted under the circumstances of these Chapter 11 Cases.  Specifically, maintaining a single consolidated list of creditors will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties-in-interest and reduce the potential for duplicate mailings.  Indeed, many of the Debtors' creditors overlap, and thus, to the extent that the Debtors are required to maintain separate mailing matrices, a substantial number of parties likely would receive multiple copies of the same notice.

102.    Accordingly, the Debtors, working with Epiq, have prepared a single, consolidated list of the Debtors' creditors in electronic format.  To ensure that no parties-in-interest are prejudiced, the Debtors will make their consolidated list of creditors available in readable electronic format to any party in interest who so requests.  Accordingly, I submit that the preparation and maintenance of a single consolidated creditor list is warranted under the facts and circumstances present in these chapter 11 cases.

### N. DEBTORS' MOTION TO CHANGE HEARING VENUE FROM PIKEVILLE TO LEXINGTON IN CONNECTION WITH FIRST DAY MOTIONS AND ALL SUBSEQUENT MOTIONS

103.    The Debtors seek to transfer the hearing venue for all Debtors (except for Shelby Resources) from Pikeville, Kentucky to Lexington, Kentucky.  While all the Debtors have offices in Fayette County, Kentucky, the appropriate division for the Chapter 11 Cases of all the Debtors except Shelby Resources, LLC is the Pikeville Division, because all of the Debtors except Shelby Resources have registered agents within the Pikeville Division.

104.    The Debtors submit that by granting this motion, and allowing all First Day Motions and all subsequent motions to be heard in the Lexington Division, as opposed to the Pikeville Division, this Court will allow for the Chapter 11 Cases to be administered in a more cost-effective manner, not just for the Debtors, but also for the Debtors' creditors and/or any and/or all other parties in interest.  As a result, the Debtors will be able to preserve assets for the benefit of their estates.

105.    The Debtors will seek to retain Frost Brown Todd LLC as their counsel in these Chapter 11 Cases.  Frost Brown Todd LLC maintains an office in Lexington, Kentucky, which will allow the Debtors to maintain costs more efficiently if hearings are held in the Lexington Division.   Furthermore, the Debtors will seek to retain Whiteford Taylor Preston, LLP as conflicts counsel, which also maintains an office in Lexington, Kentucky.  I believe this will assist with the efficiency of these Chapter 11 Cases.

I, J. Mark Campbell, the President of Cambrian Holding Company, Inc., declare under penalty of perjury that the foregoing is true and correct.

Date: June 17, 2019

/s/ *J. Mark Campbell*
J. Mark Campbell, President
Cambrian Holding Company, Inc.

0110825.0637106  4825-1330-5222v16